**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**


**STACEY BERRY,**

     **Plaintiff,**

**vs.**                                  **Case No.  5:12-CV-39-CAS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

     **Defendant.**

_____/


<u>**MEMORANDUM OPINION AND ORDER**</u>

     This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and reference by District Judge

Richard Smoak.  Doc. 10.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful

consideration of the entire Record, the Court affirms the decision of the Commissioner.

**I.  Procedural History of the Case**

     On or about July 9, 2007, Plaintiff, Stacey Berry, filed a Title XVI application for

Supplemental Security Income (SSI), alleging disability beginning January 22, 2006.

R. 14, 70, 120.  (Citations to the Record shall be by the symbol "R." followed by a page

number that appears in the lower right corner.)

     Plaintiff's application was denied initially on December 10, 2007, and upon

reconsideration on April 10, 2008.  *Id.* at 14, 70, 72, 74-76, 80-82.  On April 22, 2008,

Plaintiff filed a request for hearing.  *Id.* at 14.  On February 2, 2010, Plaintiff appeared

and testified at a hearing conducted by Administrative Law Judge (ALJ) John D.

Thompson, Jr., in Panama City, Florida. *Id.* at 14, 30. Charles K. Heartsill, an impartial

vocational expert (VE), testified live during the hearing. *Id.* at 14, 53-59, 89-92

(Resume). Robert S. Karsh, M.D., a medical expert, testified by telephonic means. *Id.*

at 31-38, 93 (Resume). Plaintiff was represented by David E. Evans, an attorney. *Id.* at

14, 28, 30, 77-78.

On February 17, 2010, the ALJ issued a Decision denying Plaintiff's application

for benefits. *Id.* at 11-14, 21. On March 25, 2010, Plaintiff filed a request for review, *id.*

at 9, which was denied by the Appeals Council on December 23, 2011, after

consideration of additional evidence, *id.* at 4, 393-95 (Jan. 29, 2010, report from Jean E.

Cibula, M.D., Shands Healthcare). *Id.* at 1-6. The Decision of the ALJ stands as the

final decision of the Commissioner.

On February 21, 2012, Plaintiff filed a complaint with the United States District

Court seeking review of the ALJ's decision. Doc. 1. The parties filed memoranda of

law, docs. 12 and 13, and those have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff was 34 years old on the date of the application and 37 years old at
   the time of the hearing, had an 11th grade education, and no vocational
   training. R. 18.

2. Plaintiff "has not engaged in substantial gainful activity since July 9, 2007, the
   application date." *Id.* at 16.

3. Plaintiff has several "severe impairments: a history of fibromyalgia symptoms,
   history of hyperventilation syndrome and history of neurovascular
   headaches." Plaintiff's "medically determinable mental impairment causes no
   more than 'mild' limitation in any of the first three functional areas and 'no'
   limitation in the fourth area" and "is non-severe." *Id.* at 16-17.

4. Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* at 17.

5. Plaintiff "has the residual functional capacity [RFC] to perform a full range of light work." *Id.*

6. Plaintiff "is capable of performing her past relevant work as a cashier – checker. This work does not require the performance of work-related activities precluded by the claimant's credible [RFC]." *Id.* at 21.

7. Plaintiff "has not been under a disability, as defined in the Social Security Act, since July 9, 2007, the date the application was filed." *Id.*

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 416.920(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

---

record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Further, pain may be subjectively experienced by a claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

<u>Wilson</u>, 284 F.3d at 1225. *See* 20 C.F.R §§ 416.929 (explaining how symptoms and pain are evaluated); 416.945(e) (regarding RFC, total limiting effects). This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.

To analyze a claimant's subjective complaints, the ALJ considers the entire record, including the medical records; third-party and the claimant's statements; the claimant's daily activities; the duration, frequency, intensity of pain or other subjective complaints; the dosage, effectiveness, and side effects of medication; precipitating an aggravating factor; and functional restrictions. *Id.* The Eleventh Circuit has stated: "credibility determinations are the province of the ALJ." <u>Moore</u>, 405 F.3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

## IV. Evidence from the Administrative Hearing

### A. Plaintiff's Hearing Testimony

After brief opening comments by ALJ Thompson and an opening statement by counsel, Plaintiff was sworn in to testify. *Id.* at 26-60.

The testimony of Ms. Berry began after Dr. Karsh testified. *Id.* at 39. Ms. Berry was born on January 23, 1973, and was 37 years of age. *Id.* at 39, 120. She has an 11th grade education and did not obtain a GED nor attend any vocational or technical training. *Id.* at 39.

Ms. Berry's last substantial gainful employment was at the Sonic Drive-In in Panama City in 2005. *Id.* at 40. Ms. Berry worked as a car hop. People placed their

orders and she would run the food out to the cars. During that job, Ms. Berry was required to be on her feet most of the day. She lifted as much as ten pounds or so. *Id.* at 41. Ms. Berry also worked as a cashier at Wal-Mart for a brief period of time. She was also on her feet most of the day for that job and occasionally carried more than 20 pounds. *Id.* at 42. Since that time, Ms. Berry has been receiving help from her mother. *Id.*

Since July 2007, Ms. Berry was under the care of Dr. Baomi (phonetic), a general family practitioner until August 2009, but now sees Dr. Tabbaa, a neurologist. *Id.* at 42-43. Ms. Berry stated that her current medications include: Plaquenil, Seroquel, and Klonopin, Prevacid, and Atenolol. *Id.* at 43. She last saw Dr. Tabbaa "[j]ust last month" and the visit was paid by Medicaid. She last saw Dr. Crayton, a rheumatologist, over two years ago. *Id.* at 44; *see id.* at 299 (12/12/07 patient note).

She stated that Dr. Tabbaa is not exactly sure what is causing the muscle spasms. *Id.*

She was sent to a neurological specialist in Gainesville. *Id.* at 44; *see id.* at 393-95. She had an attack in the office. Ms. Berry explained that during these attacks, her muscles take over and she cannot stop her movements. She stated that the muscles constrict and it becomes hard for her to speak. This happens all over her body. *Id.* at 45.

Ms. Berry stated that she experiences these attacks almost daily and they come on with no specific trigger. Ms. Berry thought the attacks started back in 2007, when she was Neurontin because she was having severe reactions to the Neurontin. She stated she was taken off the Neurontin, but the attacks continued. Ms. Berry explained

that the attacks usually last 25 minutes to an hour and she just has to wait them out. *Id.*
at 45-46.

Ms. Berry received a mental health assessment in 2009 from Magellan
(phonetic), but has not been back since. She was taken there after she overdosed. *Id.*
at 46-48. Ms. Berry was put in the hospital for a 48-hour evaluation. *Id.* at 48.[2]

Ms. Berry stated that the medicines prescribed by her doctors have been of little
help to her, although she would be in a great deal of pain if she were no longer on any
medications, such as Seroquel that helps her sleep. *Id.* at 47. As of the hearing,
Ms. Berry stated she was not taking medication for depression. *Id.* at 48.

Other than Medicaid, Ms. Berry is receiving child support for her 17-year-old
daughter and food stamps. *Id.* at 48-49. Her daughter attends high school. She stated
that she lives in mobile home with a roommate, but her mother helps her financially. *Id.*
at 49. Ms. Berry is able to do light household work such as light dusting and dishes and
cooks maybe a couple of nights a week, but her daughter cooks most of the time. *Id.* at
50. She unable to do much outside of that and that her daughter helps her quite a bit.
*Id.* at 50-51. When she is not doing light chores, she is usually sleeping because of her
pain. She also has trouble sleeping at night and sleeps about four hours a night.
Ms. Berry had been taking Ambien, but was taken off of it and put on Seroquel and
Klonopin. *Id.* at 51.

Ms. Berry does not drive and if she goes anywhere, a friend usually takes her.
*Id.* at 51-52. Ms. Berry does not belong to any clubs or organizations, but usually

---

[2]   Ms. Berry was admitted to Bay Medical Center in July 2009 for an overdose of
Ambien. *Id.* 381-90.

spends her time watching TV or reading. *Id.* at 52. She attends her daughter's

concerts. She has not taken any trips outside Florida in the last two years. *Id.* at 53.

### B. Charles K. Heartsill (Vocational Expert)

Mr. Heartsill testified, without objection, as an impartial vocational expert. *Id.* at

9, 53-63. Mr. Heartsill reviewed Ms. Berry's vocational materials. *Id.* at 54-56.

Mr. Heartsill described Ms. Berry's past relevant work as a cashier-checker.

Based on Ms. Berry's description, he described this work as between light to a little

above light work, not quite medium, with a SVP of 3. *Id.* at 56.

The hypothetical posed to the VE consisted of the following: An individual, 37

years old with a limited 11th grade education, who can read, write, and speak English,

with past work experience as a cashier-checker, who can do full range of light-duty, can

sit, stand, and walk for at least six hours in an eight-hour day, lift 20 pounds up to one-

third of the day, 10 pounds or less more frequently, up to two-thirds of the day, has no

postural or manipulative limitations within those weight limits, nor has any

communicative or environmental limitations. The VE stated that such an individual

could perform her past relevant work according to the Dictionary of Occupational Titles

(DOT). *Id.* at 57.

Ms. Berry's attorney asked her how often she had the attack she referenced, and

she responded that she had them up to three times a day. Ms. Berry said that she does

not know whether stress triggers the attacks. *Id.* at 57. The attacks last approximately

25 minutes to almost an hour. *Id.* at 58.

The VE was then questioned by Ms. Berry's attorney. The VE was asked if an

individual experienced attacks three times a day lasting from a few minutes to an hour,

and that person would not have the use of any extremities during the attacks, if that would have an impact on work activity. *Id.* at 58-59. Mr. Heartsill stated this would preclude an eight hour work day. *Id.* at 59.

### C. Robert S. Karsh, M.D. (Medical Expert)

The hearing began with the testimony of Robert S. Karsh, M.D. *Id.* at 32. Dr. Karsh is a board certified internist with a subspecialty in rheumatology. *Id.* at 32, 93. Prior to the hearing, Dr. Karsh reviewed the medical evidence of Ms. Berry's case and had been designated by the Commissioner as qualified to offer a medical opinion concerning Ms. Berry's case. *Id.* at 33. Dr. Karsh did not render any medical services to Ms. Berry. *Id.*

Dr. Karsh testified that, based on the medical evidence, Ms. Berry has had several acute illnesses over the years. He stated she had diverticulitis and a gall bladder problem. She also had abnormal laboratory tests, which were indicative of rheumatoid arthritis. *Id.* He further stated that her CCP was positive, which is a newer and more effective test for rheumatoid arthritis; however, her tests for inflammation of the joints are "perfectly normal, i.e., her sedimentation rate and her C-reactive protein [CRP] are normal." *Id.* at 33-34, 217-18, 220.

Dr. Karsh explained that rheumatoid arthritis is a disease where the lining of the joints become inflamed, called synovitis. *Id.* at 34; *see* n.3, *infra.* It is also a condition where erosions can be found in the bones or joints. Ms. Berry's medical record indicates that she had no synovitis and no erosions were found. *Id.* He also stated that an MRI done on her left hand revealed nothing. Dr. Karsh stated that Ms. Berry did not

meet Listing 14.09 for inflammatory arthritis. *Id.* The ALJ then asked Dr. Karsh how, given the totality of the evidence, would a person be otherwise functionally limited.

Dr. Karsh pointed out that in several places, the records indicate that Ms. Berry has fibromyalgia. *Id.*; *see* n.4, *infra*. Dr. Karsh explained that fibromyalgia is based on subjective complaints of pain and there is no objective diagnosis for it. Dr. Karsh stated that it is believed to be a chronic pain syndrome in which a person experiences pain in an abnormal way, experiencing pain from things that normally do not hurt. *Id.* at 35. Dr. Karsh also stated that it is difficult to judge whether this impairment is disabling because it is based on subjective complaints. "There are no objective findings that go with a diagnosis of fibromyalgia. It is just that the person who is afflicted says he or she hurts, and there are 18 so-called trigger points, 11 of which must be positive." *Id.* Dr. Karsh, however, pointed out the presence of headaches, "but they are said to be manageable on her therapy, and this is in [Exhibit] 15F, 11/2/09 [*id.* at 358]." *Id.* at 35.

Although, Dr. Karsh felt Ms. Berry's neurological examinations were negative, she has had spells which are called dystonic posturing. *Id.*; *see* n.8, *infra*. Dr. Karsh explained that dystonia means that the tissues in the body are either exaggerated or hypotonic and interferes with voluntary motions. *Id.* at 35-36. Dr. Karsh stated that Ms. Berry had had these "funny posturings" and they have been observed on several occasions by physicians. Dr. Karsh referred to Exhibit 14F, *id.* at 356, an examination by neurologist Dr. Jacob. During the examination, Ms. Berry began to have a spasm spell. Dr. Jacob opined that her spasm was not dystonia, athetosis, ballismus, ballismus, or myoclonus and it was not involuntary. Dr. Jacob did not examine Ms. Berry. *Id.* at 36, 356.

Dr. Karsh stressed that nobody has found any abnormal neurologic findings. Dr. Karsh then referenced Exhibit 15F and the findings that Ms. Berry's spasms could be psychogenetic or caused by some of her medication. The findings in Exhibit 15F also observed that Plaintiff had some facial tics consistent with Tourette's syndrome and it was recommended she see a psychiatrist. Dr. Karsh also mentioned that Dr. Tabbaa stated that Ms. Berry has not had any seizures. *Id.* at 37, 363-64; *see id.* at 361-62 (Dr. Tabbaa noted that at Ms. Berry's visit on July 23, 2009, he "observed multiple tics and she was diagnosed with Tourette's syndrome."). Dr. Karsh explained that Tourette's begins in childhood, and if inherited, a person has a 50/50 chance of getting it. Tourette's consists of facial and vocal tics. He did not believe Ms. Berry had Tourette's syndrome. *Id.* at 37. Dr. Karsh stated that "what we are left with is a strange motion -- physical behaviors, with fibromyalgia, and with laboratory tests for rheumatoid arthritis, but no manifestation of the physical disease." *Id.*

The ALJ asked if there would be any other listing other than Listing 14.09 that would be applicable to the medical records. *Id.* Dr. Karsh stated that there is no listing for fibromyalgia or for all of the neurologic disorders--"there's nothing that matches this strange behavior." *Id.* at 38. Dr. Karsh stated that he agreed with the Physical RFC Assessment performed on April 10, 2008, by Dr. Kelly in Exhibit 12F, R. 331-37, in which Dr. Kelly opined Ms. Berry could occasionally lift and carry 20 pounds, up to 10 pounds frequently, and stand for six hours a day, and no other limitations. *Id.* at 38, 332-35.

### D. Medical evidence

Ms. Berry was examined and treated by Krzysztof (Kris) Lewandowski, M.D. (at Gulf Coast Medical Center, *see* R. 238-39), from approximately July 14, 2006, through August 16, 2007. *Id.* at 223-35, 258-64. The record includes several lab results and handwritten patient notes that are difficult to read. *Id.*

On or about January 17, 2007, Dr. Lewandowski referred Ms. Berry to the Arthritis and Sports Care Center (Center) by for evaluation of potential rheumatoid arthritis (RA). *Id.* at 218, 305.[3] (Several patient notes are duplicates. For example, pages 218-19 and 305-06 are the same.)

On her first visit to the Center on January 17, 2007, Hulon E. Crayton, M.D., a rheumatologist, noted Ms. Berry "has had generalized joint pain for at least the last 2 years," but it was "getting progressively worse." *Id.* at 218, 305. Ms. Berry had been prescribed Plaquenil and Celebrex without any significant reduction in symptoms. *Id.* Ms. Berry "had blasts of steroids which give her probably 50% reduction with a mild decrease in her rheumatoid factor." *Id.* Ms. Berry had no reported active joint swelling and none from the records that Dr. Crayton observed. She did not have fever, nausea, vomiting, or diarrhea. Ms. Berry had a rheumatoid factor as high as 139; however, her CRP is normal at 2; SED rate is normal at 10; ANA is negative; although her rheumatoid factor was reported at 151 at one time with a SED rate of only 7. The muscular exam "reveals full ROM without synovitis," although her fibromyalgia trigger point exam is

---

[3] "Rheumatism" is a "popular name for a variety of disorders marked by inflammation, degeneration, or metabolic derangement of connective tissue structures of the body, especially the joints and related structures, including muscles, bursae, tendons, and fibrous tissue, with pain, stiffness, or limitation of motion. Rheumatism confined to the joints is more precisely called *arthritis*." Dorland's Illustrated Medical Dictionary 1639 (32nd ed. 2012).

positive. *Id.* at 218, 305. Dr. Crayton assessed that Ms. Berry had high positive rheumatoid factor of unknown origin ("no obvious symptoms compatible with RA at the present time") and fibromyalgia[4] that appeared to be the cause of her present and current pain symptoms and not RA. Ms. Berry was prescribed Cymbalta. *Id.* at 18, 219, 306.

On February 7, 2007, Ms. Berry presented to the Center for a follow-up. *Id.* at 217, 220, 232, 304. Cymbalta made her extremely nauseated--vomiting and headaches. She also stated that the Prevacid was not helping her stomach pain. Her CCP antibodies were "markedly positive at 309." *Id.* at 217, 232, 304. Dr. Crayton's assessment was: RA. Fibromyalgia and dyspepsia due to inappropriate dosing of Prevacid. *Id.* Dr. Crayton gave Ms. Berry instructions regarding taking medications, including Prevacid, Celebrex, and Plaquenil. Humira was also prescribed and to be taken every other week. *Id.*

On February 21, 2007, and March 6, 2007, Ms. Berry had MRI's of the right and left hands, respectively, with no discrete erosions, pannus formation or synovitis. *Id.* at 221-22, 313-14.

On March 13, 2007, Ms. Berry presented to the Center stating that her overall swelling and stiffness were decreasing, but she was still having problems with her stomach. *Id.* at 216, 231, 303. Synovitis was resolved. The MRI results of her hands were noted. She was diagnosed with RA, fibromyalgia, and dyspepsia. Celebrex was decreased. *Id.*

---

[4] *See* Land v. Astrue, Case No. 5:09cv369 SPM/MD, 2011 U.S. Dist. LEXIS 21694, *19-22 (N.D. Fla. Jan. 6, 2011), for a good discussion of fibromyalgia.

On June 14, 2007, Ms. Berry complained of losing feeling in her arms; having urinary incontinence; cramping and pain in her legs; sleep disturbance; and headaches. *Id.* at 215, 230, 302. Upon physical examination, her fibromyalgia trigger-point exam was positive. Dr. Crayton assessed Plaintiff with RA, although it did not appear to have any activity at this time, and neurological symptoms that could be CNS (central nervous system) in origin. Dr. Crayton noted that it was questionable whether Plaintiff was having any leukoencephalopathy or other disease secondary to her Humira or perhaps MS. Plaintiff was prescribed Toradol for her pain. A referral to neurology was made "for completeness sake." *Id.*

On June 29, 2007, a CT scan of the brain was performed because Plaintiff was experiencing convulsions. The impression was: "unremarkable noncontrast CT brain." *Id.* at 249, 264.

On July 30, 2007, an MRI of Ms. Berry's brain was performed. *Id.* at 247-48. The MRI revealed vascular branches in the left frontal region which the physician noted most likely represented a relatively prominent venous angioma. The notes indicated that this is somewhat larger that usually seen for venous angioma and made it difficult to absolutely exclude an arteriovenous malformation, although there was no prominent arterial supply appreciated. It was noted that a follow-up may be helpful and if there is a question clinically, an arteriogram may be a consideration. *Id.* at 247. (On August 6, 2007, Dr. Tabbaa reviewed the MRI brain films indicating a "left frontal venous angioma" and determined that "the findings are unremarkable." *Id.* at 269.)

A July 31, 2007, EEG report revealed the following impression: "normal awake, drowsy, and sleep EEG." *Id.* at 265. Dr. Tabbaa also determined on August 6, 2007, that the July 31, 2007, EEG report "was normal." *Id.* at 269.

On or about July 26, 2007, Dr. Lewandowski referred Ms. Berry to the Bay Neurological Institute (Institute) by for evaluation of her possible seizures, which apparently started on June 28, 2007. *Id.* at 272. Ms. Berry was examined by Mutaz A. Tabbaa, M.D., F.A.C.P., a neurologist. *Id.* at 270. Dr. Tabbaa noted that because Ms. Berry was "somewhat a poor historian," Dr. Tabbaa had her boyfriend explain that Ms. Berry had complained of spasms, rigidity in the arms, head, and neck with jerking and that she was taken to Gulf Coast Medical Center for examination. Ms. Berry never lost consciousness or awareness "throughout the spell." Ms. Berry reported having headaches and "the attack lasted for 'eight hours.'" *Id.* at 272. After further questioning, Dr. Tabbaa noted that Ms. Berry changed her story and stated that the attack may last two hours. "At the end of [his] examination the patient stated that she started to have her symptoms and what [he] observed was simply hyperventilation attack with tetany of both upper extremities and subsequently [he] had the patient breath through a paper bag and asked her to breath slowly in and out and she was able to control her attack. The patient did not develop any headaches. She did not have any eye findings during the symptoms she had in the office, which were described by her and her boyfriend as being similar to all the previous attacks." *Id.*

Dr. Tabbaa noted that his findings are consistent with "hyperventilation syndrome." *Id.* at 270. He diagnosed chronic neurovascular headaches, chronic

intractable musculoskeletal pain secondary to fibromyalgia and RA, and chronic intractable sleep disturbance probably due to depression and anxiety disorder. *Id.* Dr. Tabbaa prescribed Xanax for short term use; magnesium oxide as a headache prophylaxis, and Remeron. Ms. Berry stated she did not tolerate Cymbalta previously prescribed by Dr. Crayton. *Id.*

On August 6, 2007, Ms. Berry returned to the Institute for a follow-up and reevaluation of her hyperventilation syndrome and muscle contractions. *Id.* at 268-69. Ms. Berry complained of GI disturbance including constipation, abdominal pain, and perianal pain. Dr. Tabbaa noted that when Ms. Berry first started to sit for the EEG (July 31, 2007), the technician observed muscle spasms in Ms. Berry's arms while she was awake, alert, and conversing. Dr. Tabbaa noted that Plaintiff had a normal mental status exam; normal muscle tone and strengths of 5/5 in both upper and lower extremities; asymmetrical deep tendon reflexes; normal sensory exam to pinprick and touch bilaterally; normal gait; and negative Romberg's sign. The EEG was normal. Dr. Tabbaa reviewed the brain MRI film "and the findings are unremarkable." *Id.* at 269. Dr. Tabbaa also prescribed Depakote ER to help control Ms. Berry's migraine. *Id.* at 268.

Plaintiff returned to Gulf Coast Medical Center on August 8, 2007, when Plaintiff, complaining of abdominal pain, was examined by Dr. Lewandowski. *Id.* at 238-39. Past medical history included RA, fibromyalgia, and headaches. *Id.* at 238. She also had abdominal pain and constipation, which the doctor noted could possibly be related to diverticulitis. *Id.* at 239. Plaintiff was referred to a gastroenterology service consult at the same medical center. *Id.*

On the same day, Plaintiff was examined by Christopher Wells, M.D. *Id.* at 236-237. Ms. Berry indicated she had been cramping for the past ten days. Plaintiff was noted as having leukocytosis with a white blood cell count of 20,000. Her current medications were Humira, Xanax, Remeron, Celebrex, Prevacid, Hydroxychloroquine, and Atenolol. She had a CT scan of the abdomen that showed thickening in the rectal wall as well as mild prominence of the intra and extrahepatic bile ducts near the pancreatic head. Her physical examination was positive for joint pain associated with RA. *Id.*

A contemporaneous CT scan also revealed cholelithiasis with mild intra and extrahepatic biliary dilatation and prominent soft tissues and stranding in the perivaginal and perirectal region. *Id.* at 242-44, 256-57. Fluid was seen within the rectum. The physician's notes revealed that Ms. Berry's differential could include inflammatory bowel disease such as an ulcerative colitis or Crohn's. The doctor also noted that a neoplasm could not be completely excluded. *Id.* at 243. A rectal biopsy showed a focal mild acute cryptitis, and scattered acute inflammatory cells were seen within the lamina propria. *Id.* at 251. Dr. Wells recommended that Ms. Berry complete a seven-day course of antibiotics and follow-up as an outpatient in one to two weeks. *Id.* at 240.

Ms. Berry returned for another follow-up at the Institute on September 17, 2007. *Id.* at 266-67. Ms. Berry still complained of attacks that developed into severe tetany and musculoskeletal pain. Dr. Tabbaa's diagnosis remained the same. Examination results were the same, including a normal mental status exam. *Id.* at 266. Dr. Tabbaa explained that her attacks are secondary to anxiety disorder and he recommended she see a psychiatrist. *Id.* (The ALJ commented that this explanation and recommendation

was Dr. Tabbaa's early theory that he returned to by August 2009. *Id.* at 19.) Lunesta was prescribed to help Plaintiff sleep and she was kept on Depakote for another two to three months for headache prevention. For fibromyalgia and musculoskeletal pain, Dr. Tabbaa recommended Plaintiff see her rheumatologist, Dr. Crayton. *Id.* at 267.

On October 17, 2007, Ms. Berry returned to Dr. Crayton and was "described as having panic attacks by the neurologist." *Id.* at 301. No CNS disease has been found and no synovitis noted. Ms. Berry was no longer taking Neurontin and was prescribed Depakote. She did not tolerate Cymbalta due to headaches. *Id.* The assessment was RA without active disease and fibromyalgia with on-going symptoms. A trial of Lyrica was prescribed. *Id.* (On October 17, 2007, a nerve conduction study was performed for evaluation of polyneuropathy and the study did not meet minimal nerve conduction criteria for polyneuropathy. *Id.* at 307-12.)

On November 21, 2007, was examined by Dr. Crayton. *Id.* at 300. Fibromyalgia trigger-point exam was positive; no synovitis was noted. The assessment was fibromyalgia without active disease and fibromyalgia. Lyrica was increased. *Id.*[5]

On November 8, 2007, Ms. Berry met with George L. Horvat, Ph.D., "for a clinical evaluation with a Mental Status." *Id.* at 274-76. During the evaluation, Ms. Berry's attention, concentration, and memory were normal and she was oriented times four. *Id.* at 275. She was cooperative; her mood was normal; and her affect was full range and appropriate. Dr. Horvat noticed that Ms. Berry was preoccupied with pain. She showed

---

[5]   On December 12, 2007, Ms. Berry was examined by Dr. Crayton and she reported that "Lyrica has really helped her headache as well as some of her other pains. She is still seeing neurology." The assessment was RA doing well and fibromyalgia. *Id.* at 299. Prescriptions for Lyrica, Lunesta, and Humira were refilled. Dr. Crayton suggested discontinuing Celebrex and Plaquenil, if able. *Id.* This is the last patient note from Dr. Clayton. *Id.* at 215-22, 299-314.

no signs of hallucinations and her organization was logical. Her intelligence level and her fund of knowledge appeared to be average based upon verbal and math skills demonstrated during the interview. Ms. Berry stated she was exhausted and did not like getting out of bed. *Id.* She said she gets dizzy spells and her pain makes it impossible for her to get comfortable. *Id.* at 275-76. Dr. Horvat stated that her deficit areas were in the areas of activities of daily living and her family and service systems are her main supports. Her social judgment is normal, but she isolates and stays home. *Id.* at 276. He diagnosed Ms. Berry with Pain Disorder (Axis I); no diagnosis for Axis II; and assigned her a current Global Assessment of Functioning (GAF) scale rating of 50. Dr. Horvat concluded: Ms. Berry "is capable of handling her own finances. If she can be cleared physically to return to work, there are no psychological reasons why she cannot do so. Her psychological treatment program can be scheduled around her work commitments." *Id.* (The latter findings are given full weight by Dr. Schilling in his December 4, 2007, Psychiatric Review Technique (PRT). *Id.* at 289.)

On December 4, 2007, Robert Schilling, Ph.D, P.C., performed a PRT. *Id.* at 277-90. His medical disposition and category included "impairment(s) not severe" and ""somatoform disorders," the latter described as "pain disorder." *Id.* at 277, 283. Dr. Schilling determined, regarding criteria B of the Listings and functional limitations, that Ms. Berry had *mild* restriction of activities of daily living, *mild* difficulties in maintaining social functioning, and *mild* difficulties in maintaining concentration, persistent, or pace and no episodes of decompensation. *Id.* at 287. Dr. Schilling's

criteria B and C findings are discussed in more detail in his consultant's notes. *Id.* at 289.[6]

On December 10, 2007, Dianne Benauer, a consultant, performed a Physical Residual Functional Capacity Assessment. *Id.* at 291-98; *see id.* at 151-52 (notes of telephone contacts with Ms. Berry). She determined that Ms. Berry could occasionally lift and/or carry 50 pounds; frequently with and/or carry 25 pounds; stand and/or walk (with normal breaks) about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and could push and/or pull at the unlimited level, other than as shown for lift and/or carry. *Id.* at 292. Ms. Benauer explained the bases for her conclusions, referring to several March, July, and August 2007 office notes and tests. *Id.* Ms. Benauer determined that Ms. Berry had no postural, manipulative, visual, communicative, or environmental limitations. *Id.* at 293-95. Ms. Benauer found that some of Ms. Berry's functional statements "are reasonable and others are disproportionate" and, as a result, assigned only partial credibility to these statements. Ms. Benauer also noted that Ms. Berry made a statement on an August 25, 2007, form M44-P that "she is limited due to her pain, but she is able to complete light housekeeping such as dusting and folding laundry as well as cooking light meals." *Id.* at 296. Ms. Benauer notes that there were no treating or examining source statements regarding Ms. Berry's physical capacities in the file. *Id.* at 297.[7]

---

[6]  On April 2, 2008, Keith Bauer, Ph.D., performed a second PRT (on reconsideration). *Id.* at 317-30. Dr. Bauer identified the same medical disposition and category as Dr. Schilling as well as recognized the same somatoform disorder such as pain disorder. *Id.* 317, 323. He also recognized the same functional limitations. *Id.* at 327. In his consultant's notes, Dr. Bauer briefly describes Ms. Berry's medical history and ultimately concluded that Ms. Berry did not have a severe mental impairment. *Id.* at 329.

On December 19, 2007, Ms. Berry was re-evaluated by Dr. Tabbaa in light "of

her spells that felt to be the secondary to hyperventilation initially. She has chronic

intractable neurovascular headaches." *Id.* at 315. During the exam, Ms. Berry was

awake, alert, oriented, fluent, and appropriate with normal mental status exam. She

had normal muscle tone and strength of 5/5 in upper and lower extremities. The

sensory exam and Ms. Berry's gait were normal. "During the examination, the patient

stated that she was starting to have the attack of spasm in the muscle, and she

developed spastic torticollis on the left with dystonia [8] for the right arm and right leg.[9]

---

[7] On April 10, 2008, Robert H. Kelly, D.O., performed a second Physical Residual Functional Capacity Assessment. *Id.* at 331-38. He determined that Ms. Berry could occasionally lift and/or carry 20 pounds (not 50 pounds); frequently with and/or carry 10 pounds (not 25 pounds); and like Ms. Benauer, stand and/or walk (with normal breaks) about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and could push and/or pull at the unlimited level, other than as shown for lift and/or carry. *Id.* at 292. Like Ms. Benauer, Dr. Kelly found no postural, manipulative, visual, communicative, or environmental limitations. *Id.* at 333-35. He found Ms. Berry's symptoms to be partially substantiated by the medical evidence. *Id.* at 336. Like Ms. Benauer, he noted that there were no treating or examining source statements regarding Ms. Berry's physical capacities in the file, although he explained the bases for his conclusions, referring in the main to several 2007 office notes and tests. *Id.* at 337-38. In particular, he noted: "ADL Claimant: Pain and stiffness in joints, neck, spine, hands, severe headaches and fatigue. She is able to prepare some meals, and take care of personal needs with difficulty. She does some housecleaning and laundry with help. She is able to shop, but does not drive." He further determined that Ms. Berry "is capable of performing this RFC." *Id.* at 338.

[8] "Dystonia" means "dyskinetic movements due to disordered tonicity of muscle; cf. *dyskinesia*." Dorland's Illustrated Medical Dictionary 582 (32nd ed. 2012). "Dyskinesia" means "distortion or impairment of voluntary movement, as in tic, spasm, or myoclonus." *Id.* at 578.

[9] Dr. Tabbaa noted that the symptoms for these attacks started in June 2007 after the patient was treated with Neurontin, which was prescribed mainly for her neurovascular headaches. Neurontin was discontinued when the patient visited the emergency room on multiple occasions. Dr. Tabbaa prescribed Depakote and she did very much better until she started on Lyrica in the last two months and the spells started again. "These represent dyskinetic adverse reaction to Neurontin and then to Lyrica.

She did not have any clonic activities.  She did not have any seizure-type of activities."

*Id.*  Dr. Tabbaa's assessment included acute attacks of dystonia secondary to

Gabapentin and to Lyrica; chronic intractable neurovascular headaches; chronic

intractable musculoskeletal pain secondary to fibromyalgia with a diagnosis of RA by

Dr. Crayton; chronic intractable sleep disturbance and history of chronic major

depressive disorder and anxiety disorder; and incidental findings of left frontal venous

angioma.  *Id.* at 316.  Dr. Tabbaa had a lengthy discussion with Ms. Berry and her

boyfriend and he asked them "to stay [on] Lyrica because Lyrica is a derivative of

Neurontin.  Both of them have caused acute dystonia and the patient improved until we

stopped Neurontin initially."  *Id.*  Ms. Berry was given a prescription for Ativan to use as

needed until her attacks subside and also prescribed Amitriptyline (replacing Lunesta or

to be taken with Amitriptyline if needed) for treatment and to prevent headaches.  *Id.*

On March 27, 2008, Dr. Tabbaa noted that Ms. Berry had cancelled her

appointment in January 2008 and ran out of Amitriptyline for almost two (2) months.

*Id.* at 373.  She reported recurrent headaches and worsening in her musculoskeletal

pain and poor sleep at night if she does not take Ambien.  She has not suffered any

recent attacks of dystonia after ceasing Lyrica and Neurontin.  The exam results were

similar to prior results, with a normal mental status exam.  *Id.*  The assessment was also

similar.  Dr. Tabbaa noted that Ms. Berry reported doing very well when she was on

Amitriptyline and she was given a refill that should prevent her headaches and help her

musculoskeletal pain.  *Id.*[10]

---

The patient is sleeping well, according to her, with Lunesta.  The Lyrica may have
helped her headaches but caused these attacks of dystonia."  *Id.* at 315.

On June 26, 2008, Dr. Tabbaa noted Ms. Berry has chronic musculoskeletal pain secondary to fibromyalgia with a history of RA followed by Dr. Crayton; and chronic depressive and anxiety disorder.  Ms. Berry gained some weight taking Amitriptyline; however, Amitriptyline has helped with her headaches which are now less frequent. She was also taking Tylenol as needed for her headaches and also taking magnesium. The exam results and assessment were similar to prior results, with a normal mental status exam.  *Id.* at 372.

On October 27, 2008, Ms. Berry stated to Dr. Tabbaa that she had become uninsured and dropped all of her medications for almost two months including her Topamax, which helped her headaches.  *Id.* at 371.  She reported daily headaches for the past several weeks and was being referred to Dr. Michsin for pain management. She was exercising about 30 minutes a few days a week, but not sleeping well because of the pain in the muscles.  She reported "that she has pain in every part of her body." *Id.*  Dr. Tabbaa advised Ms. Berry that her worsening headaches are probably due to her stopping Topamax and he gave her a refill to start immediately.  He also gave her a prescription for Ambien to help her sleep.  The exam results and assessment were similar to prior results, with a normal mental status exam.  *Id.* at 371.

On February 11, 2009, Ms. Berry was admitted to Gulf Coast Medical Center for three days (discharged on February 14, 2009) for abdominal pain, nausea, vomiting, acute diverticulitis, clostridium difficile colitis, RA, hypertension, migraines, chronic back

---

[10]  Ms. Berry received medical care from Dr. Zabia at Panama Internal Medicine Associates from March 12, 2008, through May 2009.  Complaints varied from bladder spasms, arthritis, fibromyalgia, GERD, insomnia, knee pain, sinus trouble, and dystonia. *Id.* at 374-80, 369-70 (Dr. Tabbaa noted on March 2, 2009, that Ms. Berry was managed mainly by Dr. Zabia (her family physician) who is prescribing Humira.).

pain, and muscle spasms. *Id.* at 341. Ms. Berry was diagnosed with intestinal infection due to clostridium difficile colitis, urinary tract infection, migraine headaches, and facet disease. *Id.* While in the hospital, a CT of Ms. Berry's abdomen and pelvis were performed. (A comparison was made with the August 8, 2007, CT.) The CT of the abdomen revealed status post interval cholecystectomy and splenic granulomata. Otherwise, it was an unremarkable CT of the abdomen. *Id.* at 343. The CT of the pelvis revealed improved but persistent perirectal inflammatory changes suggesting proctitis. *Id.* at 344.

On March 2, 2009, Dr. Tabbaa noted similar issues raised by Ms. Berry. *Id.* at 369-70. She reported having recurrent attacks of upper respiratory infections as well as several hospitalizations for colitis. *Id.* at 370. Ms. Berry thought Humira may have contributed to the infection. Ms. Berry reported no improvement in her musculoskeletal pain and actually reported worsening. Her anxiety is reported as bad and she has some anxious tremors at times, but no recurrent dystonic movements. She is taking Topamax and reports numbness in her hands. She also uses Ambien at night for sleep. The exam results and assessment were similar to prior results, except that she had multiple trigger points in the upper and lower back. *Id.* The mental status exam was normal. *Id.* Dr. Tabbaa asked Ms. Berry to lower the dose of Topamax because of her complaint of numbness in her hands. He prescribed Effexor for her musculoskeletal pain. *Id.* at 369.

On May 20, 2009, Ms. Berry reported that she was starting to have attacks of dystonia again with twisting and tonic movements of the neck and upper extremities. *Id.* at 367-68. Dr. Tabbaa recounted that Ms. Berry was first evaluated in July 2007, when she presented with attacks of dystonia. *Id.* at 368. Dr. Tabbaa believed that the prior

attacks were caused by Lyrica. These attacks reportedly now happen once every two days and last up to twenty-five minutes. They subside spontaneously. *Id.* During the current exam, Ms. Berry had a dystonia attack with severe torticollis with her neck turned to the left and dystonia in both arms. She also had hyperventilation during the attack. *Id.* at 367. The physical exam results and assessment were similar to prior results. The mental status exam was normal. *Id.* Dr. Tabbaa counseled Ms. Berry to stop Effexor completely. She was given a prescription for Ativan to be used on an as needed basis. Ms. Berry was requested to call in the next three days if the episode subsided or not. *Id.*

Ms. Berry was reevaluated on June 24, 2009, in light of a recent flare-up of dystonic movements. *Id.* at 366. The spells almost disappeared except maybe one every two months when she had mild symptoms. Ms. Berry was swimming four days a week and walking 30 minutes to an hour daily. She reports moderate headaches; anxiety and depression are still bad. Ms. Berry has taken Topamax since June 2008 and taking Ambien at night, but she only sleeps three to four hours a night. The physical exam results and assessment were similar to prior results, including a finding that no dyskinetic movements or dystonia were observed throughout the exam by Dr. Tabbaa. *Id.* Recent and remote memory testing was normal. *Id.*

On July 10, 2009, Ms. Berry was admitted to the Bay Medical Center for an Ambien overdose. *Id.* at 381-90. Ms. Berry stated she took an overdose of Ambien because she was tired of dealing with the pain. The notes stated that she was hopeless, helpless, has feelings of guilt and worthlessness, and that she was tearful and depressed. Ms. Berry stated that she had too many physical problems and did not

wish to live. *Id.* at 388. She was given a current Axis V, GAF scale rating of 42, with the opinion that her highest GAF scale rating in the past year was 55. *Id.* at 389. The hospital further assessed Ms. Berry with hypertension, gastroesophageal reflux disease, headaches, RA, and chronic back pain. *Id.* at 387. After admission, refection, and consultation with John R. Billingsley, M.D., Ms. Berry advised that she realizes "she has things to live for and that she cannot be doing that." Her insight and judgment were a bit impaired, but it was thought to be due to being in chronic pain, but generally adequate. *Id.* at 389. Ms. Berry was discharged on July 11, 2009, as there was nothing they were going to do for Ms. Berry "in terms of the primary problem which is chronic pain." *Id.* at 389-90.

During Ms. Berry's exam on July 23, 2009, Ms. Berry stated that she was beginning to have attacks daily. *Id.* at 363-64. The physical exam results were similar to prior results, except Dr. Tabbaa's observation that Ms. Berry had facial tics, ocular tics, and head movement tics throughout the exam and broke out in tears on and off. *Id.* at 363-64. The assessments were similar to prior results, except Dr. Tabbaa added "major depressive disorder," *id.* at 363, which also appears in a later note, *id.* at 359. Dr. Tabbaa explained to Ms. Berry the possibility that stressful factors were throwing her into depression and that she does not have seizures. Dr. Tabbaa also explained the results of a recent normal EEG (July 2, 2009) and the findings of multiple tics that are consistent with Tourette's syndrome. Ms. Berry was currently taking Topamax and now started on Venlafaxine with the dosage to be increased. Dr. Tabbaa recommended Ms. Berry go to Life Management, a mental health facility, to follow-up with a psychiatrist. *Id.* at 363.

On August 20, 2009, Ms. Berry, accompanied by her daughter, reported to Dr. Tabbaa that she is having a spell of severe dystonic posturing in the arms, the legs, and the neck almost daily. *Id.* at 362. She reported that she cannot break the spell when she is spastic. Each attack lasts 15-30 minutes. Ms. Berry suffers no loss of consciousness and no loss of awareness. No loss of bladder or bowel function is noted. *Id.* Ms. Berry reported working on seeing a psychiatrist at Life Management.[11] She also stated that Dr. Crayton recently released her because he is not able to offer anymore help. *Id.* (The last patient note in the record from Dr. Crayton is December 12, 2007. *Id.* at 299). Ms. Berry was taking Ambien and Topamax. The physical exam results and assessment were similar to prior results. *Id.* at 361-62. After a lengthy discussion with Ms. Berry, Dr. Tabbaa prescribed Seroquel; the same dose of Topamax; to stop taking Klonopin; and Venlafaxine tapered down and then discontinued. *Id.* at 361.

On August 25, 2009, Ms. Berry went to E. Jacob, M.D.'s office. He is a neurologist. *Id.* at 356-57; *see id.* at 209-10. During the appointment, Ms. Berry "started having what appears to be a contortion type of movements. Her arms and legs were going into different positions. She was keeping her mouth open, drooling and was talking and saying sounds and did not make any sense." *Id.* at 356. He advised Ms. Berry's boyfriend to take her to the ER or to contact Dr. Tabbaa. After observing Ms. Berry for over 25 minutes, Dr. Jacob "found that the patient's abnormal contortion

---

[11]    The ALJ states that "by August 2009, Dr. Tabbaa had gone back to the theory he had in September 2007 when he told her that her attacks were secondary to an anxiety disorder and she should see a psychiatrist (Exhibit 5F/2). He was of the belief that there was a psychological component to the claimant's continued problems. However, a subsequently state psychological exam by Dr. Horvat [Nov. 8, 2007, *id.* at 274-76] was negative for psychological factors and two state consulting psychologists [Dec. 4, 2007, *id.* at 277-90; April 2, 2008, *id.* at 317-30] agreed that she did not have a severe mental impairment (Exhibits 6F, 7F, 11F)." *Id.* at 19-20, 266.

type movements were not in favor of a diagnosis of dystonia, athetosis chorea or ballismus or of any type of involuntary movement such as myoclonus." Dr. Jacob stated that he could not examine her "when she is exhibiting this type of behavior." *Id.* at 356.

On September 17, 2009, Ms. Berry presented to Gulf Coast Medical Center with a dystonic episode, with complaints of jittery movements in her muscles. She was diagnosed with jittery movements, RA, tobacco abuse, and discharged the same day. *Id.* at 348, 354.

On September 23, 2009, Dr. Tabbaa noted Ms. Berry's experience at Gulf Coast Medical Center. *Id.* at 359-60. (Dr. Tabbaa noted that the dystonia attacks started in July 2007 and disappeared at the end of 2007 and re-appeared in May 2009. *Id.* at 360.) Ms. Berry was "now taking Seroquel at night. She reports some improvement in her headaches. She is still not sleeping well. She has musculoskeletal pain and she reports soreness in the muscles." *Id.* The physical exam results and assessment were similar to prior results. *Id.* at 359-60. Dr. Tabbaa again assessed Ms. Berry with "major depressive disorder." *Id.* at 359. A detailed discussion with Ms. Berry was noted, including that she had not been to a psychiatrist, but she was being sent to a neurologist and a psychiatrist by the Department of Social Security and Disability. Ms. Berry was kept on Seroquel; taken off Ambien, which was not effective and her overdose was noted; and placed back on Klonopin and continued on Topamax. *Id.* at 359.

During Ms. Berry's last reported exam with Dr. Tabbaa on November 2, 2009, Dr. Tabbaa again noted Ms. Berry's reported attacks of dystonic movements occurring every two to three days and lasting maybe 20-30 minutes and further noted that "[t]here

are still no specific triggering factors or relieving factors." *Id.* at 358. (On October 20, 2009, Dr. Tabbaa, knowing that Ms. Berry was applying for disability benefits, *id.* at 358, reported to Social Security that he was "not willing to evaluate" Ms. Berry for Social Security disability purposes. *Id.* at 213.) Ms. Berry is still taking Klonopin, which has not made a significant difference and still taking Seroquel, which has improved the severity and frequency of her headaches besides being on Topamax. "The headaches are manageable." *Id.* at 358. Ms. Berry reported "diffuse musculoskeletal pain, but she does have a history of rheumatoid arthritis and fibromyalgia." *Id.* She had not yet been to a psychiatrist. Dr. Tabbaa noted that Ms. Berry was applying for disability benefits. *Id.* (Unlike other patient notes from Dr. Tabbaa, the November 9, 2009, patient record consists of one page and with what appears to be an incomplete assessment. *Id.*)

Exhibit 18F contains one, three-page patient record from Shands Healthcare (Shands) dated January, 29, 2010. Ms. Berry was referred to Shands by Dr. Tabbaa. R. 44, 393-95.[12] This patient record was filed with the Appeals Council on or about February 22, 2010, after the hearing held on February 2, 2010, and after the ALJ rendered his Decision on February 17, 2010. *Id.* at 5, 392. The Appeals Council considered, but rejected this "additional evidence." *Id.* at 1.

Jean E. Cibula, M.D., conducted the initial evaluation at Shands. *Id.* at 395.[13] During the evaluation, Ms. Berry began to have an attack in which her muscle

---

[12] Ms. Berry told the ALJ that she went to Gainesville (Shands) for an initial assessment. *Id.* at 44-46. She was scheduled to see a psychologist the day after the hearing. *Id.* at 46-47.

[13] Dr. Cibula is a Clinical Assistant Professor, Epilepsy Division, Department of Neurology at Shands. *Id.*

movements became distorted. Dr. Cibula stated it was not an epileptic seizure, but asked Dr. Ramon Rodriguez, a movement disorder specialist, to observe.

Dr. Rodriguez determined Ms. Berry's attacks were functional dystonia. *Id.* at 394. "The primary therapy for such disorders is cognitive behavioral therapy, although Klonopin may be useful for symptomatic management." *Id.* Dr. Cibula recommended Ms. Berry "have aggressive psychotherapy with specific emphasis on what to do should an event arise in order to somewhat recognize that is it happening and to substitute a different behavior." *Id.* at 395. Dr. Cibula opined that "there is a good chance that we can manage this." *Id.* (emphasis added). Clonazepam was increased to 1 mg twice daily and "titrated up further if necessary. I think that the Topamax is probably doing okay for her headaches. She seemed to think so, at any rate, and so I did not change any of that." *Id.* Dr. Cibula and Dr. Rodriguez hoped that Ms. Berry could be seen by a neuropsychologist and psychotherapist at Shands for at least a few times to assist in getting Ms. Berry on track. *Id.* at 395.[14]

## V. Legal Analysis

### A. The ALJ Properly Evaluated Plaintiff's Impairments

Plaintiff argues the ALJ committed reversible error by failing to determine that Plaintiff's anxiety, depression,[15] venous angioma, rheumatoid arthritis, seizures,

---

[14] Dr. Cibula also noted that Ms. Berry "has been in regular psychotherapy, I understand." *Id.* at 394. As noted above, on September 23, 2009, Dr. Tabbaa noted that Ms. Berry had not been to a psychiatrist, but was being sent to a neurologist and a psychiatrist by the Department of Social Security and Disability in light of her disability claim. *Id.* at 359. As of November 2, 2009, according to Dr. Tabbaa, Ms. Berry had not been seen by a psychiatrist. *Id.* at 358.

[15] Plaintiff states that the ALJ failed "to mention any diagnoses of depression and anxiety from Dr. Tabbaa." Doc. 12 at 12. The ALJ, however, refers to several patient

abnormal CT scan with rectal thickening, and leukocytosis were severe impairments or stated otherwise that the ALJ erred in finding these impairments were non-severe. *See* Doc. 12 at 11. In addition, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's psychological problems involving repeated episodes of dystonia and/or panic attacks. *Id.* Substantial evidence supports the ALJ's evaluation of Plaintiff's impairments.

The ALJ determined that Plaintiff had several severe impairments: a history of fibromyalgia symptoms, history of hyperventilation syndrome, and a history of neurovascular headaches. R. 16. Under these findings, the ALJ analyzed Plaintiff's mental impairments per the Psychiatric Review Technique (PRT) and determined that Plaintiff had *mild* limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and that Plaintiff had no episodes of decomposition. *Id.* at 16-17. This determination was based on Dr. Horvat's November 8, 2007, consultant's mental status evaluation and the December 4, 2007, and April 2, 2008, State agency psychologist consultants' PRT evaluations. *Id.* at 16-17, 274-76, 277-90, 317-30.

---

notes from Dr. Tabbaa pertaining to these complaints: September 2007 ('her attacks were secondary to anxiety disorder and she should see a psychiatrist'); June 2009 ("Although she complained of anxiety and depression, her mental status exams were normal."); July 2009 ("[T]he claimant complained of major depression and she displayed multiple tics." "He informed the claimant that stress may be causing depression and that she did not have seizures. He strongly suggested that she see a psychiatrist."); August 2009 ("[B]y August 2009, Dr. Tabbaa had gone back to the theory he had in September 2007 when he told her that her attacks were secondary to an anxiety disorder and she should see a psychiatrist (Exhibit 5F/2). He was of the belief that there was a psychological component to the claimant's continued problems."). R. 19.

Plaintiff's mental status exams with Dr. Tabbaa, a neurologist, are generally normal. *Id.* at 266, 269, 315, 362, 370-73, 366, 368. (The ALJ referred to two such normal exams among several. *Id.* at 19.)

On August 6, 2007, Dr. Tabbaa's assessment included a finding that Plaintiff's chronic intractable sleep disturbance was probably due to depression as well as anxiety disorder. *Id.* at 269. This finding continued in subsequent patient notes. *Id.* at 19, 266, 316, 365, 367, 370, 371, 372, 373. On September 17, 2007, Dr. Tabbaa explained to Plaintiff that her attacks were secondary to anxiety disorder and she should see a psychiatrist. *Id.* at 19, 266.

On July 23, 2009, Dr. Tabbaa's assessment included a finding of "major depressive disorder," and he strongly suggested that Plaintiff see a psychiatrist. *Id.* at 19, 363. On August 20, 2009, Dr. Tabbaa noted that Plaintiff was "still working on" seeing a psychiatrist. "Major depressive disorder" is also noted in the assessment. *Id.* at 19, 361-62.

As of September 23, 2009, Plaintiff "still had not seen a psychiatrist," although it was noted that Plaintiff was taken to the emergency room (at Bay Medical Center, *id.* at 381-90)[16] for an overdose on Ambien and that the Department of Social Security and Disability was sending her to a neurologist and a psychiatrist. *Id.* at 359-60. Plaintiff had not seen a psychiatrist for treatment purposes as of her November 2, 2009, exam with Dr. Tabbaa. *Id.* at 358. (The ALJ mentions Dr. Tabbaa's notes referring to

---

[16] Plaintiff was reported as being "very, very depressed with worsening headache, and she does not want to be a burden on anybody and wanted to kill herself. Right now, she is feeling well other than having some headache." *Id.* at 386. Another patient note stated, in part, that Plaintiff denied any further suicidal and homicidal ideation; "[n]o history of any other psychiatric illness. At this time she is not being treated by a psychiatrist or therapist." *Id.* at 388.

Plaintiff's complaints of anxiety and depression and the normal nature of Plaintiff's mental and physical exams. *Id.* at 19.)

Plaintiff implies that Dr. Tabbaa opined that Plaintiff suffered from severe mental impairment and placed limitations upon Plaintiff. Doc. 12 at 11-13. Dr. Tabbaa, however, declined to evaluate Plaintiff for the purpose of her disability claim, *id.* at 213, and did not expressly place any work-related limitations on Plaintiff. As noted above, as characterized by the ALJ, *id.* at 20, although Dr. Tabbaa described Plaintiff's bizarre physical symptoms as "psychogenic" in origin and recommended she see a psychiatrist, his patient notes show normal or largely normal mental-status examinations. Further, Dr. Tabbaa did not prescribe any psychotropic medication for mental impairments and Plaintiff did not follow-up with his recommendation for her to see a psychiatrist.

As noted by the ALJ, by August 2009, Dr. Tabbaa "had gone back to the theory he had in September 2007 when he told her that her attacks were secondary to an anxiety disorder and she should see a psychiatrist (Exhibit 5F/2). He was of the belief that there was a psychological component to the claimant's continued problems." *Id.* at 19.

The ALJ also noted that the psychological exam by Dr. Horvat was negative and that two subsequent state consultants agreed that Plaintiff did not have a severe mental impairment. *Id.* at 19-20. The ALJ discussed Dr. Karsh's testimony and noted, in part, that Dr. Tabbaa "indicated that [Plaintiff's] dystonic attacks were psychogenic." *Id.* at 20.

The ALJ also recaps the opinions of the three psychologists that Plaintiff "did not have a severe mental impairment and that there was no basis, from a psychological

viewpoint, that she could not work." *Id.* at 21. At this point in the Decision, the ALJ briefly discussed Plaintiff's admission to Bay Behavioral Health Center (Bay Medical Center) in July 2009 and specifically referenced Exhibit 17F, pages 8-10, *id.* at 388-90, which is a physician-patient note describing Plaintiff's admission. *Id.* at 21. The ALJ concluded that this "brief admission" would not alter the assessments made by the three psychologists "as the claimant has apparently not sought out further mental health treatment since this more recent overdose incident." *Id.*

It was not until January 29, 2010, when Plaintiff was examined by Dr. Cibula at Shands.[17] Dr. Cibula opined that Plaintiff needed "aggressive psychotherapy with specific emphasis on what to do should an event arise in order to somewhat recognize that it is happening and to substitute a different behavior. I think there is a good chance that we can manage this." Future visits to Shands were suggested. *Id.* at 395.

A claimant's failure to seek mental health treatment is a proper factor for the ALJ to consider in assessing credibility. Sheldon v. Astrue, 268 F. App'x 871, 872 (11th Cir. 2008) (unpublished) (citing Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (explaining that in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); *see* Carnley v. Astrue, No. 5:07cv155/RS/EMT, 2008 U.S. Dist. LEXIS 113930, at *27 (N.D. Fla. Aug. 21, 2008) (same).[18]

---

[17] Dr. Cibula reviewed and electronically signed a three-page report on February 1, 2010, the day before the hearing commenced. *Id.* at 14, 395. This report was provided to the Appeals Council on or about February 22, 2010. *Id.* at 5, 392. This report was not before the ALJ for consideration, but was considered by the Appeals Council. *Id.* at 1.

[18] In Regennitter v. Commissioner of SSA, 166 F.3d 1294 (9th Cir. 1999), the court was critical of the rejection of mental impairments based on a lack of treatment.

Substantial evidence supports the ALJ's consideration of Plaintiff's reported

anxiety and depression.

Plaintiff also argues that the ALJ should have found that Plaintiff had severe

mental impairments based on the GAF scale rating of 50 assigned by Dr. Horvat in

November 2007, *id.* at 276, and the then current GAF scale rating of 44 (actually 42)

when Plaintiff was admitted at Bay Medical Center on July 10, 2009 and discharged on

July 11, 2009. *Id.* at 381-90. Doc. 12 at 14-15. *See* n. 19, *infra*.

The American Psychiatric Association: *Diagnostic and Statistical Manual of*

*Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) states that the GAF scale

is used to report "the clinician's judgment of the individual's overall level of

functioning" (with regard to only psychological, social, and occupational functioning)

and "may be particularly useful in tracking the clinical progress of individuals in global

terms, using a single measure." DSM-IV-TR 30-32, 34. A GAF scale rating of 41-50

is indicative of serious symptoms or any serious impairment in social, occupational or

school functioning. DSM-IV-TR at 34. A GAF scale rating of 51 to 60 indicates

That criticism, expressed in two circuits, has not been an actual holding in either circuit. Rather, it seems to be a logical understanding of the under-reported nature of mental illness. *See also* Blankenship v. Bowen, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with mental impairment for the exercise of poor judgment in seeking rehabilitation."). In Regennitter, the court noted that the record supported the claimant's "uncontested explanation for not seeking more treatment: he could not afford it. [The claimant] had no income for many years." Also, the claimant received regular treatment until his insurance ran out and he could "rarely afford prescription medication." 166 F.3d at 1296-97. Although Plaintiff briefly lost her insurance coverage in and around October 2008, R. 19, 371, she was insured throughout much of the relevant period. Plaintiff does not contend she could not afford mental health treatment or that such was unavailable or that her failure to seek treatment was due to mental illness itself. The ALJ also noted that Plaintiff had "apparently not sought out further mental health treatment since" the July 2009 overdose incident, despite being encouraged to seeks psychiatric help by Dr. Tabbaa. *Id.* at 21.

moderate symptoms or moderate difficulty in social, occupational, or school
functioning. DSM-IV-TR at 34.[19]

Dr. Horvat's report indicates that he attributed the score to Plaintiff's alleged
pain disorder rather than to psychological factors. In fact, Dr. Horvat stated that "[i]f
she can be cleared physically to return to work, there are no psychological reasons
why she cannot do so. Her psychological treatment program can be scheduled
around her work commitments." *Id.* at 16, 274-76.

Further, neither Social Security regulations nor case law require an ALJ to
determine the extent of an individual's mental impairment based solely on a GAF
scale ratings. In fact, the Commissioner has declined to endorse the GAF scale
ratings for "use in the Social Security and SSI disability programs," and has indicated
that GAF scale ratings have no "direct correlation to the severity requirements of the
mental disorders listings." 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug.
21, 2000).

The ALJ properly considered Dr. Horvat's exam results, including the GAF
scale rating, R. 16, 19-20, and the results of Plaintiff's admission at Bay Medical
Center, *id.* at 21.

Plaintiff also argues that the ALJ should have found several medical findings or
signs from the record to be severe impairments. Doc. 12 at 11. For example, Plaintiff
argues that the ALJ should have found Plaintiff had a severe impairment of venous

---

[19] During Plaintiff's admission to Bay Medical Center on July 10, 2009, Plaintiff's
"current" GAF scale rating was 42 with the highest GAF scale rating of 55 for the past
year. *Id.* at 389. The ALJ did not mention these GAF scale ratings; however, he
considered Plaintiff's overdose and possible suicide attempt reported in the medical
records from Bay Medical Center and did not "believe this situation would alter the
assessments made by" the three psychologists. *Id.* at 21, 47-48.

angioma.  *Id.*

On July 20, 2007, an MRI of Plaintiff's brain was performed.  *Id.* at 19, 247-48.
The MRI revealed vascular branches in the left frontal region which the physician
noted most likely represented a relatively prominent venous angioma.  The notes
indicated that this is somewhat larger that usually seen for venous angioma and made
it difficult to absolutely exclude an arteriovenous malformation, although there was no
prominent arterial supply appreciated.  It was noted that a follow-up may be helpful
and if there is a question clinically.  *Id.* at 247.

Dr. Tabbaa remarked that the MRI brain film and the findings were
"unremarkable" and "incidental findings."  *Id.* at 269, 316, 359, 361, 363, 365, 367,
370, 372-73.  In addition, CT scans of Plaintiff's brain and EEG testing were normal.
*Id.* at 19, 247, 265, 269.  The ALJ referred to Dr. Tabbaa's interpretation of the MRI
and properly did not find the venous angioma to be a severe impairment.  *Id.* at 19-20.

Plaintiff also contends that the ALJ failed to find that she had the severe
impairments of "abnormal CT scan with rectal thickening" and leukocytosis (high white
blood count), *id.* at 235-37, 242-44.  Doc. 12 at 11.  On August 8, 2007, Plaintiff went
to Gulf Coast Medical Center complaining of abdominal pain that could be related to
diverticulitis.  *Id.* at 238-39.  She was referred to a gastroenterology service consult at
the same medical center.  *Id.* at 239.  The diagnoses included "mild colitis," "internal
hemorrhoids," and "focal mild acute proctitis."  *Id.* at 240, 250-51.  Dr. Wells
prescribed a seven-day course of antibiotics and a follow-up visit in one to two weeks.
*Id.* at 240.

On February 11, 2009, Plaintiff was admitted again to Gulf Coast Medical

Center complaining of a recurrence of diverticulosis. *Id.* at 339-41. A CT scan of

Plaintiff's abdomen and pelvis was performed and the results were compared with the

August 8, 2007, CT scans. *Id.* at 343-44. Relevant here, the discharge diagnoses

were abdominal pain, nausea and vomiting, and acute diverticulitis and a further

diagnoses of intestinal infection due to clostridium difficile colitis and urinary tract

infection. *Id.* at 341. Plaintiff was discharged with apparently no follow-up care

required. *Id.* at 33, 339-41. Plaintiff did not prove how these medical findings or

conditions impacted her work-related abilities.

Further, the ALJ properly determined that Plaintiff did not have the medically

determinable severe impairment of rheumatoid arthritis. R. 16-18, 21; *see* doc. 12 at

11. The record shows that testing in January 2007 indicated that Plaintiff had a high

rheumatoid factor and a positive CCP. R. 18, 33-34, 218-19, 220, 305-06.

Dr. Crayton, a treating rheumatologist, noted that Plaintiff did not display obvious

symptoms of the disease and wondered if the rheumatoid factor test could have been

aberrant given that corollary testing (sedimentation rate and CRPs) was normal. *Id.*

Dr. Clayton also noted that other signs of RA were not present, such as active

synovitis and MRIs of the left and right hands showed no evidence of any erosive

disease. *Id.* at 18, 20, 33-34, 215-35, 299-314. Dr. Karsh, also a rheumatologist,

testified during the hearing and concurred that the rheumatoid factor testing was likely

aberrant. *Id.* at 20, 33-34.

Plaintiff argues that the ALJ should have found Plaintiff had the severe

impairments of dystonia and a seizure disorder. Doc. 12 at 16-17. The ALJ

summarized pertinent portions of the medical record. R. 16-21. Recurrent attacks of

dystonia and seizure-like symptoms are noted.  *Id.* at 18-21.  It is more than a fair inference that the ALJ considered and found Plaintiff did not have these medically determinable impairments such that any one or combination of factors would severely impact Plaintiff's ability to work.  *Id.*

The ALJ states that the "claim file presents a somewhat confused and conflicting picture of what may be wrong with" Plaintiff.  *Id.* at 20.  After noting that Dr. Crayton and Dr. Karsh appear to agree that Plaintiff does not have any real rheumatoid arthritis and that Dr. Karsh does not believe Plaintiff has fibromyalgia, the ALJ further states that

> different doctors have expressed divergent opinions regarding her claims of some type of movement disorder or possible dystonia.  Although Dr. Tabbaa did diagnose her with this dystonia at one point in time, it appears that he later changed his thinking to conclude that this problem had an underlying psychological component.  Both Dr. Karsh and Dr. Jacob, a neurologist, felt that the claimant did not suffer from any type of movement disorder.

*Id.* at 20-21.  For example, Plaintiff appeared at Dr. Jacob's office and began having what appeared to be "contortion type of movements."  After observing Plaintiff "for over 20 minutes, [he] found the patient's abnormal contortion type of movements were not in favor of a diagnosis of dystonia, athetosis chorea or ballismus or any type of involuntary movement such as myoclonus."  He could not examine Plaintiff "when she is exhibiting this type behavior."  *Id.* at 20, 356.

Physical examination and diagnostic testing were largely normal and inconsistent with Plaintiff's assertion that she had these conditions and that she is disabled.  Substantial evidence supports the ALJ's implicit finding that Plaintiff does not have the severe impairments of dystonia and a seizure disorder such that they would cause Plaintiff to be disabled and unable to perform as least light work.

Ultimately, the ALJ concluded "that the evidence as a whole shows that the claimant's assertions as to the severity of her impairments are not credible to the extent that she is totally disabled.  In fact, the evidence shows that she retains the capacity for at least light exertion consistent with her above noted residual functional capacity."  *Id.* at 21.  At least two state agency reviewing physicians as well as Dr. Karsh reached a conclusion that this claimant was able to work."  *Id.*

**B.  The ALJ Properly Determined Plaintiff's RFC and that Plaintiff can Perform Past Relevant Work**

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because it did not sufficiently account for work-related limitations caused by various conditions.  Doc. 12 at 17-19.  In making this argument, Plaintiff does not cite evidence from the record that specifically describes any work-related limitations caused by Plaintiff's alleged impairments.  *Id.*

A RFC is what claimant can still do despite her limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c).

The ALJ determined that Plaintiff retained the RFC to perform a full range of light work.  R. 16-21.  Except as otherwise noted herein regarding Plaintiff's seizure-type episodes, diagnostic imaging was normal and physical and mental-status examinations were generally normal or findings were minimal.  *Id.*  Significantly, no physician opined that Plaintiff had any work-related limitations.  In addition, on or about October 22, 2009, Plaintiff's neurologist, Dr. Tabbaa, declined to evaluate

Plaintiff for social security disability purposes, knowing that Plaintiff had applied for disability.  R. 213, 359.  (As of November 2, 2009, Dr. Tabbaa noted that Plaintiff had not yet been to a psychiatrist, notwithstanding prior recommendations.  *Id*. at 358.)  The RFC finding was also consistent with consultative examiners and non-examining State agency physicians and psychologists.  *Id*. at 16-21, 273-98, 317-38.

Furthermore, substantial evidence supports the ALJ's determination that Plaintiff could perform past relevant work.  After engaging in the credibility analysis, the ALJ incorporated into Plaintiff's RFC finding those limitations the ALJ found credible.  *Id*. at 17-21.  When determining if a claimant can perform past relevant work, the ALJ must make findings regarding the physical and mental demands of a claimant's past work and compare the demands of the past work with the claimant's RFC.  20 C.F.R. § 416.960(b); Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990).  The ALJ noted Plaintiff's past work included the job of cashier and concluded that Plaintiff could perform the job as it is generally performed in the economy.  R. 21, 40-42.  In addition, the vocational expert testified that, based on a RFC for the full range of light work, Plaintiff could perform her past relevant work as a cashier-checker.  *Id*. at 21, 53-57.  The ALJ concluded that Plaintiff could perform her past relevant work as a cashier.  *Id*. at 21.  Substantial evidence supports the ALJ's finding that Plaintiff could return to past relevant work and was, therefore, not disabled.  *Id*.

## VI. Conclusion

Considering the Record as a whole, the findings of the ALJ are based upon substantial evidence and the ALJ correctly applied the law.  Accordingly, the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits is **AFFIRMED.**  The Clerk is **DIRECTED** to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on December 10, 2012.


s/    Charles A. Stampelos_____
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**